1

1                        LARS REINHART,

2    having been first duly sworn, testified as follows:

3                         EXAMINATION

4    BY MR. HUBER:

5         Q.    Good morning, Dr. Reinhart, I am Stephen Huber, and I

6    represent all three of the plaintiffs in this case, Gerard

7    Hines, Alan Brown, and Jennifer Jordan, and you have rendered

8    an opinion as it relates to those plaintiffs; is that correct?

9         A.    Yes, sir.

10        Q.    And I should have said that you've rendered several

11   opinions contained in your report dated June 24th, 2016?

12        A.    That's correct.

13        Q.    And all of your opinions you formed in this matter

14   contained within that report?

15      A.   Yes, sir.

16      Q.   All right.  Dr. Reinhart, can we agree that all three

17   plaintiffs have observable injuries following the accident that

18   is subject to this litigation?

19      A.   Can you repeat that again?

20      Q.   Do you and I agree that all three of the plaintiffs,

21   I've just mentioned, have observable signs of an injury

22   following the accident that is the subject of this litigation?

23              MR. TRUITT:   I am going to object to the form.

24      A.   Observable in what sense, I mean, on physical

25   examination, visible inspection?  You have to be more specific.

♀

2

1      Q.   (BY MR. HUBER)  Okay.  Do we agree that all three

2   plaintiffs have objective signs of injury following the

3   accident that is the subject of this litigation?

4      A.    There was nothing to support they had any objective

5    signs.   They had subjective complaints, but certainly not

6    objective findings based on deposition testimony, witnesses at

7    the scene.

8      Q.    No.  I am sorry.  I am talking about the medical

9    records that you reviewed, were there objective signs of injury

10   to all three plaintiffs following the accident that is subject

11   to this litigation?

12     A.    As far as in the medical records themselves, is that

13   what you are referring to?

14     Q.    Yes, sir.

15     A.    Again, full subjective complaints as to locations of

16   pain.   They had some objective diagnoses consistent with

17   muscular strain/sprain type injuries, that would be the extent

18   of it.

19     Q.    Okay.  Were there diagnostic testing images of all

20   three plaintiffs showing injuries to their spine following the

21  accident that's the subject of this litigation?

22      A.   Let's be clear, I have not had a chance to review any

23  imaging studies so all I have in front of me are the reports

24  that were provided.   Typically, in my injury causation

25  analysis, I will review the imaging studies to see if it

                                                                3

1  corroborates what is reported in the radiologist reports, I did

2  not have that benefit on this case.

3      Q.   Okay.   So you have not reviewed the imaging studies

4  in this case?

5      A.   They have not been provided to me, no.   We have

6  requested them several times.

7      Q.   Okay.   Have you actually examined any of the

8  plaintiffs about your rendered opinions in this case?

9      A.   As far as physical examination, no, other than

10   reviewing their medical records that would be the extent.

11        Q.    Okay.  So you've never actually met or spoken with

12   any of the plaintiffs?

13        A.    I am sorry.  Can you repeat that again?

14        Q.    So you've never met or spoken with any of the

15   plaintiffs?

16        A.    No, I have not.

17        Q.    All right.  Going back to the objective side of the

18   injury, based upon these reports of MRIs, myelograms, CT scans,

19   and arthrograms of the plaintiffs that were contained within

20   the records you've reviewed and listed in your report, did

21   those studies, according to the report issued by the

22   radiologist, show objective signs of injury to the spine of all

23   three plaintiffs?

24        A.    Well, again, without having the benefit of reviewing

25   the images myself, there were some implications made by the

1 radiologist's reading that were potentially suggestive of

2 injuries that he or she was able to identify.  Again, without

3 reviewing it on my own to see, certain things can be

4 interpreted differently by different radiologists.  Again,

5 without seeing it myself, I can't confirm or deny either one.

6      Q.    Okay.  Do you agree that the radiologist who reviewed

7 the diagnostic testing images, that I just talked about, all

8 found herniated discs and injuries to the spine, correct?

9                MR. TRUITT:  Objection, form to the question.

10                (Court Reporter requests clarification.)

11                THE WITNESS:  Repeat the objection.  I am sorry.

12 We didn't hear it.

13                MR. TRUITT:  Object to the form of the question.

14      A.    There are certainly findings of protrusions,

15    herniations.   They are certainly characterized in the imaging

16    studies, at least the reports that were provided, these are

17    certainly more consistent with degenerative type changes as

18    opposed to related to any type of acute injury.

19        Q.    (BY MR. HUBER)  All right.  Do you believe that all

20    three plaintiffs had preexisting disc herniations that

21    preexisted the accident that is the subject of this litigation?

22        A.    I don't have any imaging studies taken before that

23    time to compare, but in my experience, all of us will have

24    degenerative changes at some point in our lifetime.   Some will

25    start earlier, some will start later, but gravity is not kind

5

1    to the body and over time it will lead to degenerative changes

2    in all of us.

3        Q.    Okay.  So when do you believe the plaintiffs' discs

4    were herniated?

5       A.    I can't give you a specific time for that.

6       Q.    All right.  Do you believe it was before or after the

7   accident that's the subject of this litigation?

8       A.    Again, I haven't had the benefit of reviewing the

9   imaging studies to tell you one way or the other.

10      Q.    Do you believe the imaging studies will allow you to

11  tell when a disc herniation took place?

12      A.    Say that again.  I am sorry.

13      Q.    Do you believe that reviewing the imaging study would

14  allow you to tell when a disc herniation took place?

15      A.    No, but you can look for objective findings that

16  would suggest an acute injury, bony edema, these types of

17  things that might be more suggestive of an acute injury as

18  opposed to something that's been there for a long period of

19  time.

20              Also, the type of degenerative changes,

21   osteophyte complex formations, these types of things are what

22   we are looking for to suggest more of a chronic as opposed to

23   acute type issues.

24        Q.   Doctor, I understand that you have a MD and that you

25   obtained that in Dallas in 1996 and since then you've practiced

6

1   emergency medicine; is that correct?

2        A.   I completed medical school in '96 in Dallas, then did

3   a three-year residency program at the University of Virginia,

4   and then started full-time practice starting in 1999, yes.

5        Q.   Okay.  And that residency was in emergency medicine?

6        A.   Yes, sir.

7        Q.   All right.  Do you have any training in the form of a

8   fellowship or a residency in neurosurgery or orthopedic?

9        A.   My residency training was limited to emergency

10   medicine.

11        Q.    Okay.   Do you have any residency training in any

12   medical specialty related to the spine?

13        A.    The spine is an integral part of the human body which

14   all of us received training on in medical school.   Also,

15   regarding acute injuries specific to the spine are covered

16   during my residency program as well.

17        Q.    Do you understand the difference between your

18   training and that of a neurosurgeon as it relates to the human

19   spine?

20        A.    The neurosurgeon is certainly trained in surgical

21   techniques management of the spine, that would be the one place

22   that would set us apart.

23        Q.    So the only training that you sets you apart from the

24   neurosurgeon as it relates to the spine is surgical techniques

25   in your opinion?

1        A.    I mean, we all have learned the same anatomy.  We

2    all look at the same x-rays and MRI studies.  Again, you know,

3    I am the first guy that's going to assess a patient for a

4    neurologic or a spinal injury and then consult a specialist if

5    surgical intervention is required.

6        Q.    And when surgical intervention is required on someone

7    you see, who do you call?

8        A.    Depends on the injury, depends on who's on call.

9    Sometimes orthopedics can cover the spine, otherwise

10   neurosurgery would.

11       Q.    Have you ever performed spinal surgery?

12       A.    I, myself, no.  Other than spinal taps in the

13   emergency department, you know, management of any kind of

14   lacerations over the spine, no.

15       Q.    Okay.  Maybe I will be more specific.

16          You've never performed any type of surgery to

17  repair a herniated disc per say?

18      A.   No, sir.

19      Q.   Have you ever visually observed a herniated disc

20  during surgery?

21      A.   Yes, I have.

22      Q.   All right.  Who was performing that surgery?

23      A.   This would have been 15, 20 years ago during

24  residency.

25      Q.   Okay.  In the practice of medicine, have you ever

8

1  observed a herniated disc during a surgery when you weren't a

2  resident you were a doctor?

3      A.   This would have been my time in South Carolina, you

4  know, I was checking up on patients I had seen in the emergency

5    department walking to the OR the next day when the neurosurgeon

6    was operating maybe one or two cases.

7         Q.    Okay.   And what year was that approximately?

8         A.    That would have been somewhere between 2000 and 2005

9    or so.

10        Q.    Okay.   What percentage of your work as litigation

11   consulting as opposed to practicing medicine?

12        A.    I still work in the emergency department on a monthly

13   basis.   Based on my monthly commitments that probably equates

14   to maybe 15 to 20 percent of my time.

15        Q.    So you think 20 percent of your time is practicing

16   medicine?

17        A.    And it fluctuates on a monthly basis, but, yeah, on

18   average, I would say probably 10 to 15 percent would be

19   practicing emergency medicine.

20        Q.    All right.   So the remainder of your professional

21   time is spent as a litigation consultant?

22        A.    Well, as a consultant at BRC, yes.

23        Q.    Okay.   What is BRC?

24        A.    It stands for Biodynamic Research Corporation.

25        Q.    Okay.   And what business is the BRC in?

9

1        A.    We perform consultation purposes for injury causation

2    analysis.

3        Q.    Have you seen any evidence that supports an opinion

4    that my clients had spinal injuries that preexisted the

5    accident that is the subject of this litigation?

6        A.    In the depositions of the three plaintiffs there's

7    certainly mentions of previous motor vehicle accidents, which

8    certainly could be possible contributing factors, at least

9    suggestive of an earlier back and neck injuries, these types of

10   things.  It wasn't in a lot of detail that was described.

11   There certainly were no medical records provided in that regard

12   either.

13       Q.    Okay.  So you are not getting medical records or

14   imaging studies that predated the accident in question that

15   suggests any injuries to any of my clients' spine?

16       A.    Again, I haven't received any imaging studies whether

17   pre or post.

18       Q.    And the medical records?

19       A.    As far as pre-medical records other than what's

20   referred to in the medical records provided, in other words, as

21   gathering part of the past medical history that some of the

22   other physicians had captured, that would be the only reference

23   to those elements.

24       Q.    All right.  Have you seen any medical records that

25   diagnoses a preexisting injury to my clients' spine that

1    preexisted to the accident in question?

2         A.    There was nothing provided to me before other than

3    what's mentioned in the medical records under "past medical

4    history gathering."

5         Q.    Okay.  Of your -- what's the prior testimony -- in

6    which cases can you identify for us where you have testified on

7    behalf of a plaintiff or plaintiffs?

8         A.    Are you -- you are referring to my testifying

9    history, is that what you said?

10        Q.    Yes, sir.

11        A.    I am just reviewing my list here.  I think you have

12   it as well just to...

13               Of the 20-so odd events there have been -- it's

14   been all for the defense.

15        Q.    Okay.  Have you ever testified on behalf of a

16   plaintiff?

17        A.   I have had plaintiff cases.   They have not gotten to

18   a point of a testifying event, but I have taken plaintiff

19   cases, yes.

20        Q.   Have you issued reports in the cases where you were

21   paid by a party?

22        A.   To date on my plaintiff cases, I have not provided

23   any kind of report.

24        Q.   Do you know how you came to be retained in this

25   matter by defense counsel?

1        A.   As far as I can recall, my operations manager

2   assigned me the case basically.

3        Q.   Do you know if BRC or you personally have worked with

4   counsel in this case prior to the incident?

5       A.    I don't recall exactly which firm Mr. Truitt

6   represents.  Like I said, I was retained by the attorney.  I

7   don't necessarily remember the firms that they work for.

8       Q.    Okay.  I think you were retained prior to Mr. Truitt

9   being in the case.  I can certainly be wrong about that, but

10  your report is addressed to Andrew Cooper at Chamblee and Ryan,

11  which is a firm in Dallas, Texas.  Does that refresh your

12  memory as to any prior work with that firm?

13      A.    As far as, I guess, I'm assuming Mr. Truitt is not

14  with that firm at this point; is that correct?

15      Q.    I think it's another counsel here when we began

16  though before, I guess, was assigned on this case, but he is

17  not a member of that firm.

18      A.    Okay.  Just so -- just so I am clear.  I couldn't

19  remember.  Mr. Cooper, Chamblee and Ryan, I have done I believe

20  one other case with them in the past.

21     Q.    Okay.  Do you know the parties, any of the defendants

22  in this case, any of the trucking company or any of the

23  insurers?

24     A.    Not that I am aware of, no.

25     Q.    All right.  Do you have any arrangement with Chamblee

12

1  and Ryan or does BRC to your knowledge have any arrangement

2  with Chamblee and Ryan regarding weight, locating the speed, or

3  opine on their behalf on other litigations?

4     A.    Absolutely not.  We are contacted on a case-by-case

5  basis.

6     Q.    Do you know when you were retained in this matter?

7     A.    It looks like, based on the dates that I have, my

8  first conference call with the client, I guess, was Mr. Cooper

9  or one of his associates was on August the 17th of 2015.

10    Q.    And when you said you made requests to see the films

11   in this case, to whom did you direct this request?

12        A.   I don't have that information in front of me.  One of

13   my support staff, I have a nurse on my support staff, who would

14   have sent e-mail request in regards to that information.

15        Q.   All right.  Did you prepare this report yourself or

16   did you collaborate with any individuals --

17        A.   No, this is --

18                  (Court reporter requests clarification.)

19                  THE WITNESS:  We kind of lost that last half of

20   your question there.  Sorry.

21                  MR. HUBER:  That's all right.

22        Q.   (BY MR. HUBER)  This report of June 24th, 2015, did

23   you prepare it by yourself or did you collaborate with any

24   individuals?

25        A.   No, this was a report that I drafted on my own.

1      Q.     Did anyone assist you in any way preparing this

2  report?

3      A.     As far as writing it itself or the text?  I mean, I

4  typed it.  My executive assistant might have proofread it for

5  me, but beyond that, that was pretty much it.

6      Q.     Okay.  You referenced a nurse on your staff a few

7  moments ago, does the nurse have any part in reviewing the

8  medical records and summarizing for you or anything of that

9  nature?

10      A.     Yes, she does.  The medical records provided are

11  summarized on my behalf which I review.  I can also review the

12  medical records independently as well.

13      Q.     Okay.  So you and the nurse reviewed the medical

14  records in this matter?

15      A.     Yes, I mean, I certainly reviewed them in preparation

16   for this deposition, yes.

17        Q.    Okay.  So let me ask you:  What else did you do to

18   prepare for the deposition today?

19        A.    I reviewed the deposition testimony of three

20   plaintiffs and the defendant driver, looked through the medical

21   records, looked at the accident report, photographs that were

22   taken at the scene, what else, looked -- reviewed my report,

23   obviously, as well.

24        Q.    All right.  Do you hold yourself out as an accident

25   reconstructionist?

                                                              14

 1        A.    Yes, sir.

 2        Q.    And have you been accepted in a court of law as an

 3   accident reconstructionist in the past?

 4        A.    Yes, sir.

5      Q.    Did you perform an accident reconstruction in this

6   matter?

7      A.    Yes, we did.

8      Q.    Okay.  Are there notes regarding that accident

9   reconstruction in any way?

10     A.    I am sorry.  Say that again.

11     Q.    Are there notes regarding your accident

12   reconstruction in any way?

13     A.    No.  Whatever we have provided in the file materials

14   that would be it.

15     Q.    Okay.  Tell me about the accident reconstruction that

16   you performed in this case?

17     A.    Okay.  Well, the first step would be to assess -- the

18   goal is to quantify the severity of this crash.  In other

19   words, can we find a delta-v or an acceleration that the

20   vehicle experienced and hence the occupants would have been

21   subjected to.

22          First step in that was reviewing the photographs

23   from the evening in question, looking at the damages, the

24   police report itself and the description from all of the

25   parties, looking at the photographs.  The damage to the

15

1   tractor-trailer appears to the left rear corner.  There's some

2   black scrub transfer marks.  The ABS light that's on the side

3   there appears to be bent underneath the frame rail.  There

4   wasn't any real other significant objective damage that we

5   could identify to that vehicle.

6          Looking at the suburban, there's scratch marks

7   that we note beginning about the midportion of the passenger's

8   side door.  The side-view mirror has been removed.  It was

9   broken off or broken away from the vehicle.  There's also a

10   gouging mark to the upper edge of the right front fender.

11                  The individual that took those photographs was

12   kind enough to put a tape measure in there and we could

13   identify that the -- based on the height demonstrated in those

14   photographs that the frame rail is most likely the area of the

15   tractor-trailer that interacted with the right front fender.

16   There's also additional damage to the right front corner bumper

17   in what appears to be pulled forward and rotated downward, and

18   based on the height of the bumper and the ICC bar of the

19   trailer that would be consistent with a snagging-type injury as

20   the tractor-trailer sideswipes the vehicle and goes past the

21   vehicle moving somewhat, a little bit faster than the suburban

22   in order for that damage pattern to occur the way it did.

23        Q.   In your reconstruction, did you determine how fast

24   the vehicles were going at the time of impact?

25        A.   There's no way for us to determine that.  We only

1    have to rely on the information provided by the drivers.  I

2    think Mr. Brown described going the speed limit around 35; the

3    tractor-trailer driver said anywhere between 25 and 30 miles an

4    hour.

5              All I can say is the key component is the

6    relative speed between the two vehicles is what's causing this

7    damage.  Whether it's happening at 50 miles an hour or stopped

8    at a few miles faster for the trailer is really irrelevant in

9    this case.  It's the difference between the speeds of the

10   vehicles that's important.

11   Q.    Did you measure the rate at which the other vehicle

12   decelerated as impact was made until they were dead stopped?

13   A.    Well, in this case, it's the -- plaintiffs' vehicle

14   has actually accelerated not decelerated as a result of the

15   interaction.  The tractor-trailer is sliding past the vehicle.

16  It's going to apply a force that's going to want to move their

17  vehicle in a forward direction, which is an acceleration event

18  and not a deceleration event.

19       Q.    We agree that those vehicles came to a stop after the

20  accident, correct?

21       A.    Well, I guess the tractor-trailer was described as

22  continuing on and Mr. Brown's vehicle did come to a stop, yes.

23       Q.    Okay.  Did you measure the rate at which it came to a

24  stop, Mr. Brown's vehicle?

25       A.    No.

♀

                                                                        17

1        Q.    How much did Mr. Brown's vehicle weigh?

2        A.    According to specifications -- let me just pull my

3  file here -- it looks like the curb weight for the Chevrolet

4  was 5230 pounds.  In addition to that, we would add the weights

5  of the four occupants which were provided -- at least some were

6    provided through the medical records for a total weight that we

7    applied to the vehicle, 5960 pounds.

8         Q.   All right.  And how about the truck how, much did

9    that weigh?

10        A.   The only information in the file was in regards to

11   statements made by the driver, Mr. Bird, but the

12   tractor-trailer and load that he was carrying in his trailer

13   was about 71,000 pounds.

14        Q.   All right.  Did you do anything to independently

15   verify if it was accurate?

16        A.   Ideally, we would like to see a load ticket to that

17   effect.  The weight of the tractor is -- the specifications for

18   that come in at about 14,700 pounds based on specs so the

19   trailer would be the difference between those two and the load

20   it was carrying.

21        Q.   Do you know what he was carrying?

22      A.    I am sorry.   Say again.

23      Q.    Do you know what the load was in this case?

24      A.    From what I understand, it was, like, frozen food or

25   something like that.

18

1      Q.    Did you perform any calculations involving the speed

2   and the weight of the 18-wheeler in this case?

3      A.    Specifically to those two other than the weight

4   provided by the driver of 71,000, there were no other

5   calculations regarding the speed other than his statement that

6   he was going around 30 miles an hour or so.

7      Q.    My understanding is you didn't do those two things,

8   the speed and the weight, did you perform any calculation to

9   determine anything in this case?

10      A.    Not with the speed or the weight, no.

11        Q.      Okay.  Did you ever visit the scene of this accident?

12        A.      I have been through that area personally about a year

13   ago on my way to Southern Alabama and driving towards the Ninth

14   Ward wanting to see the area a little bit, so I have been

15   through that area.  I don't recall if I was specifically at the

16   intersection where it occurred or not.

17        Q.      Did you get any measurements at the scene of the

18   accident, if you ever did go through it?

19        A.      Certainly didn't stop and make any measurements, no.

20        Q.      All right.  But you did drive through the scene of

21   the accident in your vehicle?

22        A.      In the past I have.  I also reviewed it on Google

23   Earth as well.

24        Q.      All right.  Did you inspect either vehicle that was

25   involved in this accident?

♀

19

1      A.    Did I hear you -- did you say, "Did I inspect either

2   vehicle," is that what I heard you say?

3      Q.    Yes, sir.

4      A.    No, I did not.   No, they were not provided.

5      Q.    All right.   Did you talk to any of these people who

6   occupied either vehicle and/or any of the tentative witnesses?

7      A.    I didn't speak with anybody involved in this case,

8   no.

9      Q.    All right.   Have you ever spoken to Najeeb Thomas,

10   the neurosurgeon hired by the defendants in this matter?

11      A.    I am sorry.   Repeat that again.

12      Q.    Have you ever spoken with Najeeb Thomas, who is a

13   neurosurgeon hired by the defendants in this matter?

14      A.    I do not.   I have never spoken with Dr. Thomas and

15   don't know him either.

16      Q.    Okay.   Tell me about the studies that you relied upon

17   in forming your opinions in this case for you.

18        A.    Do you have ones in particular you want me to review

19   or?

20        Q.    Well, you cite here in your report, Fittano involved

21   a wreck or a series of wrecks where they measured depth and

22   force of the wreck, do you recall that?

23        A.    A lot of reports refer to what you are describing.

24   Can you -- are you looking at my report?  Is there a certain

25   citation in there?

1        Q.    Yeah.  In your report, you show these were performed

2   by Fittano, F-I-T-T-A-N-O --

3        A.    Okay.

4        Q.    -- at page 7, does that refresh your memory?

5        A.    Yes, sir.

6      Q.    Okay.   Tell me about that study and why you relied

7  upon it.

8      A.    The literature -- any kind of testing can tend to be

9  very expensive to do.   There's very limited testing that's

10  available out there in the literature.   This particular test is

11  a similar article on it that's a very common issue that comes

12  up with tractor-trailers and vehicles, and what this study did

13  was essentially demonstrate what a sideswiped/turning

14  tractor-trailer does as it interacts with a passenger vehicle.

15              In this case, the contact was made to both sides

16  of the vehicle, the driver's side and the passenger's side, and

17  accelerations of the vehicle were measured during those

18  collisions.   Again, part of accident reconstruction is looking

19  for comparatives that we can find.   This being a comparative

20  article that we can then apply some of those elements to this

21  particular -- to our subject collision.

22     Q.    All right.  And we agree that there are differences

23  between the studies and other studies and what happened in our

24  case, correct?

25     A.    Yes, I mean, the subject collision is more of a

21

1  sideswipe, what I would just describe as a sideswipe-snagging

2  event as opposed to a turning event.  Some people might turn as

3  like a right-side squeeze or something like that when it comes

4  to tractor-trailers.

5     Q.    All right.  That Fittano study was just a squeeze

6  event, correct?

7     A.    It was more of turning event but it has elements of

8  the sideswipes as it broken out within that particular test,

9  because there's time stamps on individual interactive points

10  that are occurring during that time.

11        Q.    Okay.   There are also different types of vehicles

12   involved with the Fittano study compared to our accident,

13   correct?

14        A.    The vehicle in the Fittano test is different from the

15   subject, yes.

16        Q.    All right.   He moved when this 18-wheeler, Fittano

17   test, was making a turn as opposed to changing lanes, correct?

18        A.    In the Fittano test that would be the case, yes.

19        Q.    All right.   And the subject vehicle that got hit, for

20   today under the Fittano test, which would be the start I can,

21   it was stationary Fittano test but it was moving instead of

22   staying there, correct?

23        A.    Again, if this was done at speed, it's the relative

24   speed between the two vehicles that becomes important.   So the

25   fact that one vehicle was stopped and the other vehicle was

1  turning, it's the frame of reference that's being used that's

2  important.

3      Q.   All right.  Was I correct in what I've stated that

4  without vehicles moving, the Fittano test is stationary?

5      A.   As far as the Fittano test, the vehicle was

6  stationary and the tractor-trailer moved past the vehicle, yes.

7      Q.   All right.  And our accident, we basically started

8  moving at the time of the collision?

9      A.   Both vehicles were moving relatively close to the

10  same speed with the tractor-trailer moving slightly faster than

11  the subject vehicle.

12      Q.   You also relied on a Merela and White study, do you

13  recall that?

14      A.   Yes, sir.

15      Q.   All right.  And that was a study about the

16  accelerations once an 18-wheeler change its lanes, correct?

17      A.    It has to do with the time of the lane change and the

18  lateral speeds that are generated by those lane changes.

19      Q.    Okay.  Did you reach an opinion as to the time of the

20  lane change in the subject accident?

21      A.    I have not, no.

22      Q.    How did you arrive at the delta-v in this case?

23      A.    Which delta-v, the lateral or which one are you

24  referring to?

25      Q.    Whichever one you relied on to reach opinions about

                                                            23

1  injuries to my client -- clients.

2      A.    Well, in reference to the paper itself, I am

3  referring to it as a lateral delta-v of 1.7 miles per hour

4  that's directly related to the Merela paper and doing some

5  basic calculations with an average lane width and that time it

6    takes to move across that distance based on the times that came

7    out of the Merela paper, that was the peak delta-v that could

8    have been induced to the subject vehicle essentially.

9         Q.    Okay.  So tell me what you relied upon to reach the

10   delta-v, what specifically, what movant of the tractor, what

11   speed were going to see that what all that you also?

12        A.    Well, standard -- standard lane width is about 12

13   feet or so and velocity is the change in distance divided by

14   the change in time, so if you take the 12 feet and you divide

15   by the times that came out of the Merela report, and we

16   provided a range because the range varied from 4.7 seconds

17   upwards to almost 13 seconds for a tractor-trailer to make the

18   complete lane change from one lane completely into the other

19   lane.  So if you just do the math on those, what you find is

20   the lateral velocity is no more than two miles an hour

21   essentially.  So that is the most delta-v that could be

22   provided based on the Merela numbers on a lane-change event.

23        Q.    What was the action of delta-v based on the lane

24   change?  I just lost you in that paragraph.

25        A.    It would have been less than two miles per hour.

24

1         Q.    All right.  So 1.7 was what you -- it is from that at

2    the bottom of page 12 of your report, correct?

3         A.    Yeah.  I will conservatively round that up to two,

4    but, yes, 1.7 at the bottom of my report.

5         Q.    Well, throughout your paper you refer it to being 1.7

6    in your report, don't you?

7         A.    That's correct and that's fine, 1.7 or 2.0 is

8    numerically a different number but in the general sense of

9    injury potential, it's all the same.

10        Q.    Okay.  The lowest lane change time in the Merela

11   report, what did that involve?

12      A.    I am sorry.   Say that again.

13      Q.    Merela measured a number of lane changes of different

14   18-wheelers, correct?

15      A.    Yeah, it was about 90-some cases, yes.

16      Q.    All right.   Were any of those a swerve in a sudden

17   manner?

18      A.    They were all -- they were lane change events.   There

19   was video taken of them.   These were done on the highway

20   essentially.

21      Q.    I understand, but what I am asking is:   Were these

22   also lane changes based upon emergency events, like the truck

23   swerved sharply and changed early?

24      A.    Within the Merela paper, I am not aware that there

25   was.

1    Q.    Okay.  So I understand how you calculated the lane

2    change and the speed, did you calculate the force that would

3    have been exerted upon the occupants of the suburban?

4    A.    No, that's difficult to do.  What we can do is

5    provide or at least determine what forces may have been applied

6    to the subject vehicle and through Newton's Second Law can

7    determine the accelerations that the vehicle would have

8    experienced and hence the occupants would have experienced, and

9    then we can relate those accelerations to literature, research

10   papers where occupants have been subjected to various

11   acceleration fields similar to this event and make comparative

12   analysis with that.

13   Q.    Do you have an opinion as to what caused Alan Brown

14   to need spinal surgery or --

15   A.    I am sorry.  Say that again.

16   Q.    Do you have an opinion as to what caused Alan Brown

17   to need spinal surgery?

18       A.   I mean, I don't -- my scope of practice doesn't allow

19   me to make surgical determinations so, I mean, that requires

20   the expertise of an orthopedist or a neurosurgeon to come to

21   that conclusion.   My conclusion is that based on the forces

22   applied to the vehicle, based on our accident reconstruction,

23   based upon the biomechanics and the occupant motion that these

24   individuals would have experienced that the accelerations that

25   were applied to their body were well within normal tolerable

26

1   levels and certainly would not have ended in a disc -- acute

2   disc rupture or herniation as a result of this particular

3   collision.

4       Q.   Okay.   And I guess where I'm generally going is, is

5   it a coincidence that all three occupants of the suburban had

6    disc injuries according to the treating physician following the

7    accident, and I am wondering if you have an opinion as to any

8    or all of them as to how they came about to have this injury if

9    it wasn't by force?

10        A.    Well, I guess the issue disputed here is the actual

11   injury or what you are calling an injury.   Again, without

12   having the benefit of reviewing the MRI studies, the imaging

13   studies to diagnose an acute injury, I am sort of blinded to

14   that fact.

15             Again, I am looking at it from a biomechanical

16   analysis, accident reconstruction standpoint that basically

17   says that the subject incident was a minor event, that the

18   accelerations experience, and hence the forces that would have

19   been applied to their bodies, were not consistent with any

20   injury potential to cause a disc herniation, rupture, or disc

21   injury as you described.

22        Q.    Do you believe that a person can have a disc

23   herniation in a relatively minor impact in an accident such as

24   this one?

25        A.   Every impact is unique and has to be taken

                                                                    27

1   independently so to make a blanket statement, I certainly am

2   not going to do that without knowing more information about

3   what kind of impact we are talking about.

4        Q.   Okay.   Well, let's say a 10-mile-per-hour-rear-end

5   collision, do you believe somebody can herniate a disc in an

6   accident that's 10 miles per hour rear end collision?

7        A.   Again, I mean, there's a lot more factors involved

8   than just a blanket statement.   There's always a potential to

9   injury.   I would not say that either of these individuals were

10   not injured as a result of this crash.   The extent of their

11   injuries based on my analysis would have been limited to simple

12    muscular skeletal type strains/sprains that should resolve

13    within a four-to-six week period with conservative treatment.

14         Q.    Do you think that the neurosurgeon to examine these

15    patients are the better physician to talk about what did or did

16    not cause the injuries to their spine?

17         A.    First of all, the neurosurgeon certainly didn't do an

18    accident reconstruction.  I don't even know if he even saw

19    photographs of the vehicle involved.  He certainly didn't do

20    any calculations or a biomechanical analysis to assess if there

21    was an injury mechanism to even cause this injury that he is

22    supposedly identifying.

23                   So, again, I mean, that's what separates myself

24    out from these treating physicians is the fact that I have a

25    lot more information, that I am doing a true analysis to

28

1   establish a causal or noncausal relationship.

2        Q.   And, in fact, a causal/noncausal relationship, I want

3   to be clear, you did not calculate the force exerted upon any

4   of the plaintiffs' bodies; is that correct?

5        A.   Specific numbers, no, but based on the accident

6   reconstruction we have done, based on the accelerations that

7   the vehicle would have experienced, we can look at the

8   literature where they have done testing where they have

9   actually measured some of those forces and draw conclusions

10  from that.

11       Q.   Do you believe that after impact, the suburban ended

12  up on the neutral ground adjacent to the woods?

13       A.   You are going to have to explain neutral ground.

14  That's a new term to me.  I looked at the scene on Google

15  Earth.  I don't know what neutral -- neutral ground to me is

16  the line between the two barbed wire fences, that's neutral

17    ground, so there's -- I know there's a curb.   There's grass.

18    They have that overpass to the left of them.   You are going to

19    have to tell me what neutral ground is, so that must be a New

20    Orleans thing.

21        Q.    It -- do you know what a median is?

22        A.    Yes, sir.

23        Q.    All right.   Did the suburban end up on the median

24    after the impact with the 18-wheeler in this accident?

25        A.    I wasn't clear if it did or it did not, and the

                                                              29

1    median that you are referring to, there's an onramp that leads,

2    I believe to I-10 right there in that area.   My understanding

3    is that it happened in that general location.   There's some

4    grass between the bridge and the roadway.   Again, I don't know

5    if they entered that grassy area or not, that wasn't clear to

6    me.

7      Q.    Is there a curb that separates the roadway from the

8  grass where this accident occurred?

9      A.    There was a small curb that I could see on Google

10  Earth, yes.

11      Q.    How high was it?

12      A.    I couldn't give you a measurement.

13      Q.    Did you make any measurements as to any delta-v,

14  force, energy, anything that was exerted on my clients from

15  hitting that curb and going over?

16      A.    No, but there is papers out there that specifically

17  talk about these type of events.  Again, I didn't include that

18  as part of my report simply because I didn't understand what

19  neutral ground was.

20      Q.    Okay.  Knowing or not knowing what the neutral ground

21  is, did you make any calculation to that event when the

22  suburban hit the curb and went up onto it?

23      A.   No, but certainly can be done very easily.

24      Q.   Okay.  In reviewing the Fittano study, did you

25   compare the weight of the truck that was in the subject

30

1   accident with the one that used in the Fittano study?

2       A.   I didn't compare them specifically to, you know, side

3   by side.  The Fittano paper, if I recall correctly, does have a

4   load present in the vehicle.  I don't recall what they -- what

5   the amount of that load was.

6       Q.   Would it change the result of how much impact there

7   was or how much force is involved in an accident that the

8   weight of the truck changed?

9       A.   The weight of the truck in this crash is irrelevant

10   in the sense that the subject vehicle only had to take a small

11   portion of the kinetic energy that it had in order to cause the

12    damage that we see.  Whether it's a 30,000-pound truck or a

13    70,000-pound truck, I think we all agree that it's outweighing

14    the weight of the suburban by a factor of, you can pick

15    whatever weight you want.  So in the grand scheme of things

16    whether it's 70,000 pounds or 30,000 pounds, it's still going

17    to outweigh the suburban in each case.

18         Q.   If speed is the constant, can we agree that force

19    gives off based upon the weight of whatever is striking -- one

20    object striking the other, the weight of the object striking

21    the second object, does the force increase or does the speed

22    remain a constant?

23         A.   Well, I mean, you are talking about momentum

24    essentially so momentum is a factor of mass and velocity so if

25    mass goes up and velocity stays the same, then the momentum

1  certainly can.  If you are talking about energy -- I mean, they

2  are all interrelated to one another, but in general as mass

3  goes up the velocity stays the same and certainly momentum and

4  potential energy can go up as well.

5      Q.    Yeah.  I am just trying to make a commonsensical

6  point which is, we have a pee-wee football player who weighs 60

7  pounds and we have a member of the New Orleans Saints who

8  weighs 250 pounds and they are both going five miles an hour,

9  and the safety player hits you, it's going to cause a lot more

10  damage and put a lot more force than if the pee-wee football

11  player hit you, correct?

12      A.    Again, momentum and energy have to be conserved so in

13  that -- with that basic analysis, that would true.

14      Q.    Likewise, if the speed increased but the weight is

15  the same between the two football players, the football player

16  who moves faster is going to exert more energy when these two

17  players hit than the football player going slower, correct?

18      A.    Kinetic energy is related to the square of the

19   velocity so as velocity goes up, then the energy must increase

20   by definition.

21      Q.    Were there any skid marks at the scene of this

22   accident?

23      A.    There were none reported in the police report so it's

24   unknown.

25      Q.    And I take it when you drove by the scene or

32

1   approximately the scene of the accident, you didn't see any?

2      A.    I certainly wasn't looking for any, no.

3      Q.    Okay.  Did you personally perform any testing in this

4   matter?

5      A.    Yes, we did.

6      Q.    All right.  Tell me what testing you performed.

7       A.    We performed a bumper force analysis.   There's

8   information provided in my report in that regard.

9       Q.    Okay.   Did you personally perform that test?

10      A.    I was present when the test was done, yes.

11      Q.    All right.   You keep saying "we performed and I was

12  present when it was done," who actually did the testing?

13      A.    I have a research testing facility that's staffed by

14  staff that set up the test itself.   I have an engineer on staff

15  as well that assisted me with this part of the process, but I

16  am -- I am ultimately responsible and in charge of the whole

17  test.

18      Q.    Okay.   Are the people who assisted in this test

19  identified in the report?

20      A.    No, they are not.

21      Q.    All right.   Do you believe that the testing exactly

22  approximated what occurred in this accident?

23      A.   The goal of the test was not to be exact.  It was to

24   provide us some information as to the force required to cause

25   the visible damage that we could see to the bumper on the front

33

1   of the suburban, and I think our test adequately showed

2   significantly more damage than what was visible at the scene,

3   so it provided me an upper limit as to the force that was

4   applied to the vehicle as part of the snagging event between

5   the vehicle and the ICC bar of the trailer.

6      Q.   All right.  As I understand it, you put a bumper onto

7   a hydraulic mounted apparatus?

8      A.   That's correct.

9      Q.   All right.  So you moved the hydraulic apparatus

10   backward so the bumper snagged on the stationary piece of

11   steel, correct?

12          A.    That's correct.

13          Q.    And then the people doing the testing, whoever they

14    are, they measure the amount of force it took for the bumper to

15    come dislodged; is that correct?

16          A.    Yeah, the test apparatus has load cells in there

17    which measure force, and we also have the ability to measure

18    distances, but in this case, we were more interested in the

19    maximum force required to at least meet or exceed the damage

20    that we saw in the subject case.

21          Q.    All right.  Did you perform any testing to figure out

22    how much force would have been imparted onto my client, forget

23    about the bumper, just with the truck hitting the suburban?

24          A.    Again, the force is being applied to the vehicle that

25    they are riding in that provides an acceleration event.   The

34

1    acceleration is the universal ruler that we can then use to

2   look at applying forces to the body itself, but as far as

3   actually measuring the force to the body, that would be very

4   difficult to do.

5        Q.   All right.  You would have to get test dummies and

6   recreate the accident, correct?

7        A.   It would require -- true.  A full vehicle

8   reconstruction with instrumented surrogates, humans or test

9   dummies, correct.

10        Q.   All right.  And you did not do that in this case,

11   correct?

12        A.   To date we have not done that, no.

13        Q.   All right.  Did you do any testing to re-inact the

14   movement of the plaintiffs' bodies inside the vehicle based on

15   what you know about this accident?

16        A.   The motion of their bodies is going to follow the

17   laws of physics.  Based on the way the force is being applied

18   to their vehicle, their motion, by definition, has to go in a

19   certain direction.  The ability to resist some of that motion

20   if they are aware that the impact is coming, but again, you

21   can't allot -- you can't avoid the laws of physics.

22        Q.   Did you do any testing to determine how their bodies

23   moved within the vehicle during the accident?

24        A.   Specific testing to occupant kinematics, no.

25        Q.   Okay.  Did you perform any bumper testing at the

                                                                    35

1   speeds involved in this accident?

2        A.   I am sorry.  Say that again.

3        Q.   Did you perform any testing on the bumper or any

4   bumper using the speeds that were involved in the subject

5   accident?

6        A.   We did no testing specific to the speeds that were

7  reported, no.

8      Q.   All right.  Other than the bumper test that you

9  described, did you do any other testing that you yourself

10  performed or oversaw?

11      A.   No, that encompasses it all.

12      Q.   I am sorry, sir.  Would you please repeat that?

13      A.   My report would encompass all the testing that we

14  have done.

15      Q.   Okay.  So I know about the bumper testing, is there

16  any other test?

17      A.   Outside of what is in the report, no.

18      Q.   Okay.  Is there something else in the report I am

19  missing?  I don't -- I am not trying to argue with you.  I

20  just -- I am not aware of any testing you performed other than

21  the bumper test, and there's something I want to ask you about

22  it and so I don't want to read it to each other, but are you

23    aware of any other testing you performed?  You can look at your

24    report.  I am not trying to trick you.

25         A.    No.   What's in the report is the only test that I did

                                                                    36

1    on this case.

2         Q.    All right.   And that was the bumper test, correct?

3         A.    Yes, sir.

4         Q.    Okay.   Did you estimate any assumptions that

5    determined the vehicle acceleration of the subject suburban?

6         A.    There weren't any assumptions.   I mean, I have a

7    force and by Newton's Second Law, force is equal to mass times

8    acceleration so there's a direct relationship between the two.

9         Q.    All right.   In order to calculate force, what mass

10   did you use?

11        A.    It would have been the same number I provided to you

12   earlier which was the 50, I want to say around 58, 5900 pounds,

13   if I remember right, 50 -- 5960.

14        Q.    Okay.   And what was the acceleration?

15        A.    Acceleration, as far as what?

16        Q.    You told me that force equals mass times

17   acceleration.

18        A.    Correct.

19        Q.    So I am trying to figure out how you arrived at your

20   force calculation.

21        A.    Okay.   Well, when we are talking about the bumper

22   test, the bumper test provides a force measurement that

23   exceeded the damage that we saw to the vehicle so that number

24   provides me an upper limit to the maximum force that would have

25   been applied to this vehicle in a back to front direction, so

1   taking that number, also, we need to deduct out the force that

2   you have to overcome based on the rolling resistance of the

3   axles of the wheels, which came out to be about 330 pounds or

4   so, so that your net force that's being applied to the car is

5   about 300 -- 3,400 pounds or so.

6         Q.   Okay.

7         A.   So if you take that force -- if you take that force

8   and divide it by the weight of the vehicle which I gave you

9   earlier, 5960, gets you to the .6Gs that I discuss in my

10  report.

11        Q.   I understand.   And you made a clarification within

12  that explanation to effect the back to front force, correct?

13        A.   I am sorry.   Say that again.

14        Q.   You made a clarification within your explanation

15  where you said that force that you were measuring was the back

16  to front force; is that correct?

17        A.   That would have been the force that was applied to

18   their vehicle, correct.

19       Q.   Did you make any calculation to the force that was

20   applied in a side-to-side direction in the truck swerving over

21   into the suburban lane and hitting it to the side?

22       A.   Other than the inference that we can make from the

23   lane changes, the delta-v is all I have on that one and the

24   accelerations associated with that.

25       Q.   Okay.   So you never calculated the side-to-side force

38

1   yourself, correct?

2       A.   We never did any testing specifically looking at the

3   force, having looked at sideswiped impact -- or I am sorry --

4   side-impact type damage literature out there where forces have

5   been measured.   When you look at body panel damage, those

6   forces can vary anywhere between maybe 1000 or 1200 pounds on

7   the low end up to maybe 2 or 3,000 pounds.   Again, well within

8   the same realm.   We are not talking about a factor of 4, 5, 10,

9   20 above what we are seeing here.

10      Q.   I don't want to be redundant, but have you spoken to

11   any treating physicians for the plaintiffs in this matter?

12      A.   No, sir.

13      Q.   Okay.   You did not speak to the driver of the

14   18-wheeler?

15      A.   No, sir.

16      Q.   Assume with me that the radiologist and the

17   neurosurgeons who agree with the radiologist in this case are

18   all correct and the plaintiffs had herniated discs for purposes

19   of this --

20             THE WITNESS:   We are speaking --

21             (Court Reporter requests clarification.)

22             MR. TRUITT:   Let me enter an objection first.

23   You referred to "neurosurgeons," and I think it would actually

24  be "neurosurgeon."  So I am going to object to the form of the

25  question.

1                      MR. HUBER:  If he can -- I just wanted him --

2                      MR. TRUITT:  Okay.

3                      MR. HUBER:   -- to have an answer because that's

4  coached.

5                      MR. TRUITT:  Okay.  We'll see.

6      Q.   (BY MR. HUBER)  Let me ask it this way -- scratch

7  that.

8                      Neurosurgeons in this case testify that a

9  sneeze can herniate a disc, would you agree or disagree with

10  that?

11      A.   I know of one citation out there that describes that.

12  From a biomechanical standpoint, it's very difficult to come to

13   that same conclusion.

14         Q.    Najeeb Thomas testified that someone can turn their

15   head quickly and herniate a disc that requires surgery, would

16   you disagree with him?

17         A.    Again, without describing the exact circumstances, if

18   there's, you know, compressive loading being applied to the

19   spine at the time of the turn.  There's a lot more variables

20   that have to be taken into consideration when you look at the

21   biomechanics of how a disc herniates, ruptures, tears, or if a

22   fracture is associated with the vertebral body.

23         Q.    All right.  I will give you some more specifics.

24                    Assume a driver sitting behind the wheel of his

25   car, driving the car.  He is at a stop.  He put the car in

                                                                    40

 1   parked.  His window is open.  What if they would have sprayed

2   into his vehicle which causes him to move sharply to the right,

3   because it scared him.  He jerks to the right.  Najeeb Thomas

4   testified that that's sufficient force exerted from the spine

5   to require that person, who is otherwise healthy, to have to

6   have surgery to repair the disc he herniated when he made that

7   maneuver I just described, do you agree or disagree that that's

8   more probable than not?

9        A.   So you are describing a startled type reflex,

10   something coming from the left, is that how I understood you;

11   is that right?

12        Q.   Yes, sir.

13        A.   Again, without more information, I am not going to

14   make a blanket statement in that regard.  There's -- every case

15   is unique, every instance is unique.  There's a lot of factors

16   that have to be considered as part of that.  We could do

17   testing to decide whether or not it's within injury thresholds

18   or limitations.  I mean, I am not going to answer your question

19   in that form.

20        Q.    You would agree with me it's possible for somebody to

21   jerk their head in the manner I described and herniate a disc,

22   correct?

23        A.    Again, I mean, you are trying to get me to answer a

24   question that I can't answer based on the information you have

25   given me.

                                                                      41



1         Q.    Forget any information I am giving you.  Do we agree

2    that somebody can jerk their head by their own power and

3    herniate a disc, whether they sneeze, whether they are

4    startled, whatever it may be that they can herniate a disc

5    moving their head quickly?

6         A.    In my clinical experience, I have not experienced a

7    patient like that.

8      Q.    All right.  Do you have any opinion about if it's

9   possible for someone to do that?

10      A.    When it comes to medicine nothing is impossible.

11      Q.    So we agree that it's possible for somebody to

12   herniate a disc just by their own body movement, correct?

13              MR. TRUITT:  Objection, form.

14              THE WITNESS:  I am sorry.  Did you say

15   something, Mr. Truitt?

16              MR. TRUITT:  Yeah, object to the form.

17      A.    I would say it's highly improbable if that would be

18   the case.

19      Q.    (BY MR. HUBER)  Are you aware that Mr. Brown was

20   diagnosed by one of his treating physicians with a cerebral

21   concussion?

22      A.    I think Dr. Vogel is the one who made that statement.

23      Q.    So you're aware of that, correct?

24      A.    It's in his medical records.   From my medical

25    training standpoint, there's no foundation for that conclusion.

                                                                42

1      Q.    Okay.   Do you believe you are more qualified than a

2    treating physician to diagnose whether or not he had a

3    concussion?

4      A.    As an ER physician, we are the first physicians that

5    typically will see a patient where some of these initial

6    determinations are made.   There is certainly nothing in his

7    history that was reported in the medical records to even

8    suggest that conclusion.

9      Q.    Okay.   Have you ever diagnosed somebody with a

10    concussion without seeing them?

11      A.    As far as looking at concussion guidelines and

12    looking at medical records and a medical record review, yes I

13   have done that.

14        Q.    Okay.  Where were you when you diagnosed a person

15   with a concussion without actually examining the patient?

16        A.    Again, you have to rely on what the patient is

17   reporting.  So if there's no factual basis to support that

18   conclusion, you can't come to that conclusion.

19        Q.    I don't know what question you are answering, but

20   what I am asking you is:  Where were you when you diagnosed a

21   patient of having a concussion without actually seeing the

22   patient?

23        A.    Are we talking about this case or one that you were

24   referring to earlier?

25        Q.    I asked you if you've ever diagnosed a patient with a

                                                                    43

1   concussion without seeing a patient.  You gave me some

2    nonresponsive answer about concussion guidelines and then said

3    you had.

4                    MR. TRUITT:  No, I am going to object to the

5    characterization.  I think what he said is that he has done it

6    as a part of a medical record review.

7                    MR. HUBER:  Okay.

8                    MR. TRUITT:  That's what he said and you are

9    asking him where was he when he did that.  That's easy, where

10   was he.

11                   MR. HUBER:  Okay.  We are on the same page.

12                   MR. TRUITT:  We are.  We are not arguing when he

13   did that.

14                   MR. HUBER:  I have another question --

15                   THE WITNESS:  Let me be clear.  I mean, as far

16   as determining whether a concussion occurred or not, I mean, I

17   have done part of my analyses through my work at BRC in medical

18   record review settings where I have disagreed with a diagnosis

19   of a closed-head injury or concussion based on the information

20   that was provided in the medical records.

21        Q.   (BY MR. HUBER)  Okay.  And you're saying you disagree

22   with the Dr. Vogel's diagnosis of Mr. Brown had a cerebral

23   concussion?

24        A.   According to Dr. Vogel that's the case.

25        Q.   Do you agree or disagree with his diagnosis?

                                                              44

1        A.   I certainly don't find anything in the medical

2   records that would support me making that diagnosis personally.

3        Q.   So you disagree with Dr. Vogel?

4        A.   In his determination of a concussion, yes, I would

5   disagree with him.

6        Q.   Are you licensed to practice medicine in Louisiana?

7        A.   I am licensed in Texas, Virginia, and South Carolina.

8        Q.    Does that allow you to offer medical opinions in

9   Louisiana?

10       A.    I don't know what the rules are in the state of

11   Louisiana in that regard.

12       Q.    I just want to know if you believe you are able to

13   come into Louisiana and offer medical opinions?

14       A.    I certainly have the training, education, and

15   experience to do such.

16       Q.    But not the license?

17       A.    Again, I don't know.  I would have to defer to my

18   counsel as far as the rules of the state.

19       Q.    Okay.  If Mr. Brown did suffer a cerebral concussion,

20   would that change your opinions about the forces involved in

21   the accident that's the subject of this litigation?

22       A.    No, they would not.

23       Q.    Do you think the force involved in this accident was

24  sufficient in order for someone to receive a concussion?

25      A.   In this particular case, no.

45

1       Q.   So if somebody had a concussion, it wouldn't cause

2   you to rethink some of your calculations?

3       A.   Like I said, we can all agree that a force was

4   applied to this vehicle.  That force is very minimal in regards

5   to the acceleration that vehicle experienced, and with those

6   low accelerations any kind of head contact or impact would have

7   been minimal and certainly would not have resulted in a

8   concussion diagnosis.

9       Q.   All right.  Do you believe all three plaintiffs are

10  suffering from degenerative changes in their spine?

11      A.   Again, I haven't had the benefit of reviewing the

12  medical imaging studies, so I can't comment.  Based on what's

13   listed in the reports, it would certainly be very suggestive of

14   that, yes.

15        Q.    How much force is required in order for someone to

16   herniate a healthy disc, in your opinion?

17        A.    Well, that's a very good question.  I don't think I

18   can give you a specific answer.  We can look at studies that

19   have been done with cadaver spines where there -- have --

20   compressive loads have been applied and we find that the

21   vertebral bodies will fracture before the disc will rupture or

22   herniate, so typically and this also applies to my own personal

23   experience as a treating physician, that without a vertebral

24   body fracture, in other words, a bony injury to the bone

25   surrounding the disc itself then an acute herniation from a

46

 1   biomechanical standpoint is not something that occurs.

 2                I cited a report, a citation in my report from

3    Brinkman where they went in and surgically cut the annulus

4    fibrosus which is the think fibrous bands down to the last

5    millimeter of the outer band and then compressively loaded the

6    spines and again the bones would fail before the disc would

7    herniate or rupture.

8              So, I mean, the disc is a very, very tough,

9    tolerant type anatomical structure and based on the literature

10   and my own experience is that the vertebral body is what's

11   fracturing, which clearly did not occur in this particular

12   case.

13   Q.   All right.  I want to make sure I understand your

14   opinion.  In fact, in order for a healthy disc to herniate, one

15   would see a vertebral body fracture as well?

16   A.   Well, again, I mean, the discs are designed as sort

17   of the shock absorbers of the spine.  They sit in between the

18   vertebral bodies and they are designed, because we live on

19   earth here, we subject ourselves to gravitational forces

20   through our activities, through everything that we do every day

21   and just like the cars on your shock over time, over thousands

22   and thousands of loading cycles, these discs will slowly wear

23   down with time.  Genetics plays a huge component in this as

24   well and that's why you can see 20-something-year-old

25   individuals with degenerative disc changes and you can see 40

♀

47

1   and 50-year-olds that have very minimal.  It's a variable

2   spectrum out there, but at the end of the day, it's the

3   continuous loading cycles over thousands and thousands and

4   thousands of cycles that leads to these degenerative changes

5   and ultimate protrusions, herniations, and these kinds of

6   things that we are seeing.

7        Q.   Do you find it unusual that all three plaintiffs in

8   this case require spinal surgery at such young ages?

9      A.   I certainly would question that decision.  Having

10  surgery on a neck that early in age is something that I

11  certainly personally wouldn't want to do.  It is, I find

12  unusual that occurred to all three, yes.

13     Q.   All right.  And do you know of any trauma they

14  suffered that was common in all three of them other than the

15  accident that's the subject of this litigation?

16     A.   Again, this goes back to what we talked about a

17  minute ago.  I mean this accident represents one isolated

18  loading impact during this event as opposed to the lifetime of

19  activity, genetics, all of these other components that go into

20  these degenerative changes, and again, I haven't had the

21  benefit of reviewing these MRI studies to confirm or deny what

22  the reading radiologist is identifying through some of the

23  language that he uses in his report.

24 Q. Do you have an opinion as to a measurement that is

25 required, now we are talking about force, to herniate a disc?

48

1 A. Measurement as opposed to -- are you looking for a

2 number?

3 Q. Yes.

4 A. I mean, there's all sorts of published numbers out

5 there regarding, you know, compressive tension, torsion.  I

6 mean, the numbers are endless.  Depending on which level of the

7 spine, it's going to have different values as well.  So, I

8 mean, there's lots of information out there about that.

9 Q. Okay.  So let's talk about baseline, based on a

10 herniation, how much force was required to herniate their disc?

11 A. Again, based on the biomechanical analysis, based on

12 the literature that I have read, I mean, you are going to

13 fracture the bone before you see a herniation or rupture of the

14  disc.  So, I mean, those loads can be -- depending on which

15  level of spine that you're talking about and what we are

16  focussing on here is mostly compression.  I mean, compression

17  is the most common load that's being applied to your spine.

18              So, again, in this particular incident, based on

19  the mechanics, based on the way they move, based on the

20  accelerations that the vehicle experienced, it was very little

21  compression applied to their spines to even consider a

22  herniation of a disc.

23      Q.    Explain to us what is compression, how does that work

24  on the spine?

25      A.    Well, sitting here on your chair, your spine is being

                                                                49

1  compressed by the weight of your torso.  It's pushing down on

2  the vertebral bodies.  It's pushing on the discs as we sit here

3   in our 1G environment.  If I put you on the space station, you

4   are weightless.  There's no force applied to your spine.

5                    So just the simple act of being on earth, you

6   are already providing a loading event to your entire spine.

7   Now that load is going to change because the mass above each

8   level is going to change as you move down the spine, so the

9   load at the lower portion of the spine is going to be higher

10  than the load in compression that you would experience at the

11  top of your spine.

12      Q.    So now you are talking about compression and loading

13  being required to herniate a disc would also fracture a

14  cervical disc, do you believe that compression was the main

15  force embarked on the plaintiffs in a sideswipe injury?

16      A.    No.  There's components of everything.  There's

17  tension.  There's going to be compression.  There's going to be

18  torsion.  There's going to be shearing.  I mean, that's all --

19   it's not just one individual, but, I mean, it's -- they all

20   contribute their various components based on the way the body

21   is moving and reacting to the force as it's applied to the car.

22        Q.    Okay.   And I am trying to understand to herniate a

23   cervical disc, the minimum amount of force that would have to

24   be exerted upon that disc, using the least amount of force from

25   any of the different types of force activity you want, whether

                                                                    50

1   it's compression, whether it's shearing, anything, what's the

2   least amount that can be applied for a herniated disc in your

3   opinion?

4        A.    I can't give you a number.

5        Q.    I am curious about that because you calculate what

6   they are going to say, say that's not sufficient to herniate a

7   cervical disc, but I am wondering, how do you know what force

8    is sufficient to herniate a disc if you can't tell me the

9    minimum amount of force made required to herniate a disc?

10        A.    I mean, there's published injury thresholds that we

11   used.   They've look at various strengths at various levels of

12   the cervical spine.   I mean, there's published tables out there

13   that try and quantify this number as best as possible.   I mean,

14   without looking at those tables, I can't give you a specific

15   number.   When we look at compression, I mean, general ranges

16   that I have seen and based on the readings that I have done,

17   from a cervical standpoint, you are looking at several hundred

18   pounds worth of compression before you ultimately lead to a

19   failure of one of the cervical vertebra.

20                 It can be as low as 750, 800 pounds.   I have

21   seen them as high as 1500, 2000 pounds, that's specifically

22   speaking to compression, shearing, tension, I mean, they are

23   all different.   They are all going to have different ability to

24   resist forces in certain directions.

25                    So, again, when we are looking at this specific

51

1  case based on the accelerations that they experienced, I mean,

2  these accelerations are well within normal daily activities.

3  It's not an outlier here.  That's what it ultimately comes back

4  to here, that the accelerations that these folks experienced

5  was well within tolerable physiologic limits.  The things that

6  you would see in normal activities of daily living and I cite

7  some of those in the report as well.

8      Q.    Okay.  So you started to say you did not make any

9  calculation as to the amount of shear force that was being

10  applied to my clients' spine?

11      A.    I have not, no.

12      Q.    Did you make any calculations as it relates to the

13  compressive force that would have been applied to my clients'

14   spine and back?

15        A.    I did not make any specific calculations to that

16   effect.

17        Q.    All right.  What were the other types of force that

18   you talked about, tension?

19        A.    Tension is another one, yes.

20        Q.    Okay.  Did you make any calculation as to the amount

21   of force from tension that would have been applied to my

22   clients' spine in this accident?

23        A.    I did not, no.

24        Q.    All right.  What other types of forces besides

25   tension, compression, and shearing would have been applied to

                                                              52

1   my clients' spine in this accident?

2        A.    There could have been a torsion or rotation component

3   as well.   Those are --

4       Q.    Okay.   Can you make any type of estimation as to the

5   amount of torsion or rotational pull that would have been

6   applied to my clients' spine in this accident?

7       A.    I did not, no.

8       Q.    Do you have an opinion or are you aware of how much

9   force and tension needs to be applied to a spine in order for a

10  disc to herniate in the cervical spinal region?

11      A.    Well, I mean, in tension you are pulling the spine

12  apart essentially so you are not compressively loading the

13  disc.   It's acting in a different format here.   There is a

14  tensile strength to the bone.   There's tensile strength to the

15  disc, but this not -- this particular crash was not a

16  significant tensile event for any of the occupants so again

17  it's kind of a misnomer.

18      Q.    Okay.   Let's talk about shear.   How much shear force

19   is required to be applied to herniate an otherwise healthy disc

20   in a cervical spine?

21        A.    Again, shearing is -- primarily when it looks at the

22   disc herniations, you are looking mostly at compressive forces

23   or when you are in extreme areas of flexion or extension where

24   you are putting a lot of compression across the disc itself.

25   Again, I mean, this event was minor and when you do the

                                                            53

1   calculations and what I tried to establish by quantifying this

2   is that upper limit above which I believe this crash did not

3   exceed.

4                   Again, you are trying to get down to the weeds

5   here when I am looking at it more from a general perspective

6   and putting this and quantifying this crash and then performing

7   the analysis from there.

8        Q.    Can you tell me an amount of force that's required to

9   herniate a cervical disc when the force applied is shear force?

10      A.   A specific number, I don't recall seeing one.   As far

11   as specifics to the discs, there's certainly references to

12   vertebral injuries and so forth.   Again, this speaks to the

13   fact that the bone is going to yield prior to the disc actually

14   yielding as well.

15      Q.   Let's talk about flexion and extension.   I haven't

16   talked about those yet.   Did you make any calculations of the

17   amount of flexion and extension as it relates to the force that

18   was applied to my clients' spine?

19      A.   No, I did not.

20      Q.   All right.   Is there a minimal amount of force from a

21   flexion perspective or an extension perspective that requires

22   to herniate a cervical disc?

23      A.   Well, again, I mean, you are looking at the motion

24   that's being induced and how much flexion extension these folks

25   are experiencing.   The kinematics of their motion is going to

54

1   be rearward and slightly rightward as far as the direction that

2   they are going to move.   They are going to interact with the

3   seat backs that they are sitting in.   They are going to

4   interact with the head restraints.   These are all designed to

5   limit the amount of extension and hence the forces that are

6   being applied to the neck.   So, again, you have to be very

7   specific on what you want to refer to.

8        Q.    Can you tell me a number, Doctor?

9        A.    A number in what regard?

10        Q.    A number as it relates to the force, the measurement

11   that is required in order to herniate a disc when force is

12   being applied more than flexion or extension.

13        A.    Again, the vertebral body is going to fail before the

14   disc does, so you are looking at, you know, bony-type injuries

15   prior to you are going to see disc injury.

16        Q.    Would you refer back to the Najeeb's comments on the

17   opinion that a vertebral body will fail before an otherwise

18   healthy disc will wash up or herniate.  His opinion is

19   different than yours, would you defer to him as a neurosurgeon?

20        A.    Again, I am approaching it from a biomechanical

21   standpoint and what the biomechanics of these tissue structures

22   are.  I don't know what Dr. Thomas' opinion is.  It certainly

23   wasn't stated in his report.

24        Q.    You have reviewed Dr. Thomas' report?

25        A.    I briefly reviewed it, yes.

                                                              55

1    Q.    That's not listed in your report, is it?

2    A.    I don't know if it is or not.  It may have come

3    afterwards and reviewed it as part of preparation for the

4    deposition.   That's probably what happened.

5         Q.    All right.   Are there any other items that you have

6    reviewed that are not listed in your report?

7         A.    Not that I recall.

8         Q.    Do you think you are in a better position to talk

9    about injury causation than physicians who have actually seen

10   the plaintiffs?

11        A.    I think I provide a unique position in the fact that

12   I have taken one step further and quantified the severity of

13   this subject collision and then used a quantitative analysis as

14   part of the foundation for my causal analysis.   As opposed to

15   the treating physician who is solely relying upon the

16   subjective report of the patient.

17        Q.    You think you are in a better position to opine upon

18   causation of a spinal injury than doctors who are trained and

19   specialist in the spine like neurosurgeons are assigned to do?

20      A.    Again, if these neurosurgeons have done a full

21   accident reconstruction, a full biomechanical analysis through

22   a quantitative analysis, then certainly I would feel are

23   qualified to provide that opinion, but if they are relying

24   solely on what the plaintiffs are providing them, then I would

25   disagree with that.

♀

                                                              56

1       Q.    Do you think a disc can herniate spontaneously in

2   your opinion, lumbar or cervical?

3       A.    That possibility always has to be considered.   I

4   mean, like I said earlier, in medicine nothing is impossible.

5       Q.    I asked you about the different forces and the

6   requirement of a certain amount of force to herniate a disc and

7   I should have asked this question on the cervical spine.

8            Would have any of your answers changed if I was

9    asking about the lumbar spine, are you aware of force making

10   the lumbar spine --

11              (Court Reporter requests clarification.)

12        Q.   Doctor, I asked you a whole series of questions about

13   tension compression, shearing, torsion, flexion and extension

14   as it related mostly to the cervical spine, and rather than

15   repeat them all, I am wondering if any of your answers would

16   change if I was asking questions about the lumbar spine, the

17   force required to herniate a disc?

18        A.   Other than those -- I mean, the lumbar spine is

19   certainly structurally much beefier, much more solid than the

20   cervical spine so the actual force numbers certainly would be

21   different, but the same general mechanics would apply to the

22   lumbar as it does to the cervical.

23        Q.   Was your report in this matter peer reviewed?

24        A.   I am sorry.  Say that again.

25      Q.     Was your report in this matter peer reviewed?

♀

57

1      A.     I mean, to me, peer review sounds -- we usually

2   describe that in result to journal articles submitting it for

3   peer review and so forth, is that what you are implying here?

4      Q.     Anything, did another expert in any of the fields

5   that you hold yourself out in review your report and agree with

6   you, disagree with you or suggest any changes?

7      A.     Not that I recall, no.

8             MR. HUBER:  Doctor, I am going to take a brief

9   break for about two minutes and step out of the room and talk

10  to my associate, and we will be right back, and I don't know if

11  Mr. Truitt has questions or not but we are getting to be about

12  done.

13             (Break taken from 12:17 p.m. to 12:23 p.m.)

14       Q.    (BY MR. HUBER)  All right.  I am going to try to wrap

15   it up.  I've got a few more questions for you.

16       A.    Sure.

17       Q.    Has an opinion that you offered or intended to offer

18   in litigation ever been struck by a court, or a judge did not

19   allow you to offer an opinion, or have any of your opinions

20   ever been limited by a court?

21       A.    Let's see, I have had about 250 cases now.  I have

22   had 20 or so testifying events, three trial events so far, and

23   there was, I guess, one -- one -- in which standard are you

24   applying to, is it Frye or which one, is it -- does it matter

25   or?

                                                            58

1        Q.    You just explain to me, Dr. Reinhart, however you

2    usually do.

3        A.    There was one of my cases that I was struck under

4    Daubert that was placed on an appeal.  I never heard the

5    results of that appeal at this point.  Apparently the case

6    settled prior to that appeal being official, so that's the one

7    primary one that I recall.

8         Q.    Okay.  Do you know the name of the case in which you

9    were struck under Daubert by the title of the case?

10        A.    It would be one of my -- it's on the -- on my

11   testifying history because I was deposed in that one.

12        Q.    Okay.  Can you refer to that list for me and see if

13   you can identify it?

14        A.    Let's see it's, I want to say it's the Markley.  It's

15   in Florida.

16        Q.    Florida?

17        A.    And like I said, it was put on appeal and then the

18   case settled after that.  So, like I said, I don't know what

19   the ultimate outcome would have been.

20      Q.    Is that Sandra Markley versus SafeCo Insurance

21   Company?

22      A.    That sounds right, yes.

23      Q.    And what was the nature of the Daubert challenge,

24   sir?

25      A.    I guess it had to do with our use of our bumper

                                                                    59

1   crusher database information that we have.  This is a device

2   that we use for reconstructing low-speed accidents.  It assists

3   us in providing force calculations specific for cases, and it

4   was specifically targeted at that use of that database.

5      Q.    All right.  In that case, you would determine the

6   force that was applied to the accident in -- in the vehicle

7   that was involved in this collision --

8      A.    No --

9      Q.    -- is that what you were trying?

10      A.    Yeah, again, we are trying to quantify the severity.

11   It was, if a I remember correctly, a low-speed rear end

12   accident with minimal damage that was objective, the visible

13   damage.   In an attempt to quantify the severity of this crash

14   through quantitative analysis.

15      Q.    Okay.   Are you capable of determining the force

16   exerted upon the occupants in the vehicle, you, yourself, do

17   you have training and background that makes that kind of

18   calculation if you want to?

19      A.    It's -- we certainly could do that in a testing

20   environment, yes.

21      Q.    Okay.   Do you have that capability?

22      A.    We have load cells.   I mean, we could design a

23   specific test.   You could instrument, and there have been cases

24   where folks have been instrumented, where they have actually

25   put strain gauges in vertebral bodies and measured forces in

1   vivo, you know, in an actual living occupant.  I mean, that's

2   kind of an extreme case of doing that, but again, we can make

3   some inferences from that information.

4        Q.    My question before that:  Do you have the actual

5   capability that you yourself possess or that BRC possess is

6   whether or not you can test how the kinematics in the fourth

7   and third occupants with different types of force?

8        A.    Yes, we certainly have the capabilities of filming

9   occupant kinematics and stage collisions that we have done,

10   yes, we have done that type of work before.

11       Q.    All right.  Using crash test dummies, you can measure

12   force, the specific force exerted on the dummies?

13       A.    We have a -- we have crash test dummies in our lab as

14   well, we would have the capability, yes.

15        Q.    Okay.   Other than the Markley case, has your opinions

16   ever been excluded by a court before that you are aware of?

17        A.    The Markley case is the -- that's the one that I

18   recall at this time.

19        Q.    Okay.   Have your opinions ever been limited by a

20   court in any way?

21        A.    As far as limitations go, there was a recent one in

22   Texas.  I guess I was brought up on a motion in limine.  I am

23   trying to remember the name of it; I don't recall it.  I guess

24   under the motion in limine the judge excluded me as well.

25        Q.    Okay.   Do you know the basis of the motion in limine?

                                                                    61

 1        A.    I am sorry.   Say that again.

 2        Q.    Do you know the basis of the motion to limit your

 3   testimony, what the judge excluded or contested?

4        A.    I haven't had a chance to review the trial, the

5   transcript of that proceeding.  I am still kind of puzzled by

6   the judge's conclusion.

7                Again, I don't know what his reasoning was.

8   Each case is unique.  Each judge is unique.  Each venue is

9   unique.  Each judge's skill set is brought to the table is

10  unique as well.  So trying to compare apples to apples based on

11  these exclusions, I think is being taken out of context.

12       Q.    And I understand all of that, but do you know why you

13  were challenged?  Was it on your opinion?  Was it on your

14  overall qualifications?  Was it on a mistake you made?  I am

15  just throwing out options here.  I don't know anything about

16  that case.

17       A.    I don't recall the exact details of what the

18  exclusion, there was no, I guess, I don't know what the legal

19  term is, a ruling or I don't know what the right term is that

20   you guys would say for that.  Again, what the reasoning was for

21   the judge to come to that conclusion, that's for him to decide.

22         Q.   Was that a car accident case going on in Texas where

23   you were excluded?

24         A.   That was a motor vehicle accident as well, yes.

25         Q.   All right.  So the two times that you have been

62

1   excluded were Markley and more recent Texas case that you can't

2   recall and they were both involved in recreations that the

3   biomechanical calculations for car accidents?

4         A.   They were both motor vehicle accidents in which we

5   did a quantitative analysis as part of that foundational

6   support to then provide the injury causation and biomechanical

7   analysis.

8         Q.   All right.  Any other times you have been either

9    struck or limited by a court?

10        A.    Those are the only ones that I recall.

11        Q.    All right.  Just trying to be a little more clear,

12   when I am saying limited, I mean, also let's say you have four

13   opinions and the judge only allows to give three opinions.  He

14   allows you to testify but not to all of your opinions, has that

15   ever happened?

16        A.    What we have discussed is it.

17        Q.    Okay.  If you could locate your list of cases, do you

18   recognize the name of the cases in Texas where you were struck

19   on?

20        A.    I don't see it on here.  I don't -- I don't see it on

21   this list so...

22        Q.    Will you do me a favor, do you have that somewhere

23   where you can obtain it and give it to Mr. Truitt?

24        A.    I will have to check with my staff, they maintain

25   that for me, so yes, I can certainly look into that.

♀

1       Q.    I ask you to provide that to Mr. Truitt and we can

2   look at that later, just give it him and he can give it to me,

3   and I will follow up with him, okay?

4       A.    That's fine.  I will do my best to do that for you.

5       Q.    That's fair enough.

6             As I understand you bill at a rate of $400 per

7   hour?

8       A.    That's correct.  That's for the year 2016.  This file

9   was open in 2015 so my rate at that time was 325 which I am

10  still honoring.

11      Q.    Pretty good money here today, Doc.

12      A.    That's the way it goes, got to be nice.

13      Q.    All right.  Has anyone else billed any time on the

14  spinal, I haven't seen your billing records.  I am curious of

15   whether anybody else has.

16        A.    Yeah, so my support staff bills as part of the

17   billing records.

18        Q.    All right.  Do you know the total amount of the bill

19   to be paid?

20        A.    Excluding the month of August, I think I have

21   invoices through the end of June.  I don't think the -- I am

22   sorry -- through the end of July.  There hasn't been any

23   billing, other than what's this month, there was big gap in

24   there for a while.  I quickly added up the numbers that I did

25   have here and it was around 19,000 incomplete excluding the

                                                              64

1   time for this month.

2        Q.    Yes, sir.  Yes, sir.  All right.  Do you still bill

3   at trial the same rate that you do ordinary testimony?

4      A.    It's billed at the same rate, yes.

5      Q.    Okay.  So you don't have any rate of change as you

6  are working the case on behalf of the defendants whether

7  testimony, writing a report or for doing a calculation, it's

8  all at the same rate?

9      A.    My rate is billed at the same rate for all of the

10  work that I do on the file.

11      Q.    Okay.  We talked earlier about a concept of

12  degeneration, that other times people's bodies -- parts of

13  their bodies such as their disc space degenerates, do you agree

14  that that's a general proposition?

15      A.    We all will have some component of that.  As long as

16  we live on earth that will be the case.

17      Q.    All right.  Are you aware of any number that can tell

18  someone sitting, doing a job that you are doing this day, how

19  much force is required to herniate a disc that has already

20   suffered degeneration?

21        A.   Well, I point to the literature that some of which I

22   have cited in here.  A lot of these cadaver studies are done on

23   older spines, which have some degenerative components to them

24   already and even under those degenerative conditions, the

25   forces that are applied are still causing fractures under

65

1   compression essentially to the vertebral bodies prior to any

2   disc rupture.  The Brinkman study I keep coming back to where

3   they actually surgically cut the thick fibrous bands of the

4   discs to the last millimeter and under compression the bone was

5   still failing under those conditions.  I mean, that speaks to

6   the vigidity and structural integrity of the disc itself.

7        Q.   Okay.  You agree with me as a general proposition

8   that people can have herniated discs that are asymptomatic?

9        A.   I am sorry.  Say that again.

10      Q.      Do you agree with me as a general proposition that

11   people can have disc herniations that are asymptomatic?

12      A.      Absolutely, I mean, we see that all the time.

13      Q.      Okay.   Do you have a concept as to the amount of

14   force it takes to take an asymptomatic disc herniation and make

15   it symptomatic?

16      A.      Again, it speaks to specific requirements to do the

17   analysis that you are describing there.   That's -- we talked

18   about this earlier as well.

19      Q.      Okay.   But we can we agree that you can have an

20   asymptomatic disc herniation that seems symptomatic, but the

21   force required to make that change would not necessarily

22   herniate a vertebral body or crack --

23      A.      You can't -- I was going to say you can't herniate a

24   vertebral body so...

25      Q.      Yeah, I apologize.   I'll make it this --

1       A.     No, it's okay.  I understand.

2       Q.     He has a fracture of the vertebral body?

3       A.     Right.  Herniating a vertebral body would be a very

4  painful event to happen so...

5       Q.     Okay.  Do you want me to repeat it?  I will try to

6  make it more clear.

7       A.     Yeah.

8       Q.     What I am asking is:  If you have a herniated disc

9  that's asymptomatic, the force be given upon that disc that

10  makes it symptomatic that's not necessarily strong enough to

11  fracture the vertebral body?

12       A.     Again, I mean, we are talking about loading events

13  here, and it's the loading cycles over a long period of time as

14  opposed to one isolated event.  I mean, it's -- the disc is

15   essentially wearing out over time leading to those protrusions

16   or herniations that we've described so, again, at some point a

17   disc may become symptomatic.

18        Q.   Are you aware of any studies that talk about what

19   force is necessary to make an asymptomatic disc herniation

20   become symptomatic?

21        A.   I am not aware of any.

22        Q.   Okay.  And you yourself don't have any opinions on

23   the amount of force required to make an asymptomatic disc

24   herniation become symptomatic?

25        A.   Again, we are talking about an individual here, it's

67

1   going to vary across certain individuals.  I can't give you a

2   specific number.

3        Q.   Fair enough.  Will you tell me about your experience

4    as it relates to accident reconstruction or training and

5    experience in that regard?

6        A.    Sure.   Well, mechanical engineering provides the

7    foundation for that requirement, basic principles there would

8    include:   Mechanics, dynamics, kinematics, understanding

9    materials, structures, also, the laws of physics, laws of

10   motion would provide the foundation for all of that,

11   conservation momentum, conservation energy, these type

12   principles which are inherent to engineering principles.

13              And then when I joined BRC, I attended the

14   Northwest Traffic Institute.   I took Traffic Accident

15   Reconstruction 1 and 2, and that was a total of a three-week

16   course and then applied to ACTAR, which is an application

17   process.   You have to be approved based on your qualifications

18   and credentials to sit for their examination and then achieved

19   my certification through ACTAR in June, I think, of 2015.

20       Q.    Okay.   So you went to Northwest and you attended

21  school?

22       A.   It would have been Chicago, yes.

23       Q.   You went to Chicago and attended it for three weeks?

24       A.   Yeah, it was a three-week course for -- two courses

25  over three weeks.

                                                                68

1        Q.   Doctor, you were physically present for all of those

2  three weeks?

3        A.   Oh, yes, this was, you know, classroom work, going

4  through large syllabi, learning a lot of these principles of

5  accident reconstruction, how to approach problems, working on

6  accident reconstructions during the course.  There was testing

7  that was done that as part of that to kind of monitor your

8  progress and then certification when the course was complete

9  and that made me eligible then to sit for the ACTAR

10  certification examination.

11              MR. HUBER:  Okay.  I think that's all I have

12  got, Dr. Reinhart.  We will let Mr. Truitt get in there.

13              THE WITNESS:  Great.

14                         EXAMINATION

15  BY MR. TRUITT:

16      Q.   Dr. Reinhart, my name is Bobby Truitt.  I will let

17  you know that I represent the defendants in this lawsuit

18  accident.  I have some follow-up questions for you.

19              First of all, the curriculum vitae you provided

20  us, is that a current CV?

21      A.   Yes, it is.

22      Q.   Okay.  I want to attach that to your deposition as

23  Reinhart 1, and then you also provided --

24              THE WITNESS:  Hang on.  Hang on, Bobby, I'll --

25  let me -- I have a got a copy of it here so just I can kind of

1   keep up with the reporter here, if you don't mind?  Is that

2   okay?

3                   MR. TRUITT:  Okay.  No problem, yes.

4                   THE WITNESS:  We will just mark it as one, is

5   that okay?

6                   MR. TRUITT:  Yes.

7                   (Exhibit Number 1 marked.)

8      Q.   (BY MR. TRUITT)  And you also prepared a report dated

9   June 24, 2016; is that correct?

10      A.   Yes, sir.

11      Q.   And do you happen to have a copy of that that we can

12   attach to your deposition?

13      A.   I do.

14      Q.   And we will attach that as Reinhart Number 2.

15                    (Exhibit Number 2 marked.)

16        Q.    (BY MR. TRUITT)  And one last document, that I will

17   have identified is in connection with your report, did you

18   prepare a bibliography as well?

19        A.    Yes, that would be part of the report itself.

20        Q.    Okay.  So that's actually a part of the report?

21        A.    All the citations are there.  I know for deposition

22   purposes, we prepare it separately as a bibliography, but all

23   those would be the same that would be listed at the back of my

24   report.

25        Q.    Okay.  Great.  Now, Dr. Reinhart, what areas of

                                                          70

1   expertise do you typically handle?

2        A.    In this case, injury causation analysis is the

3   specific work that I do.  So it takes into consideration my

4   engineering training and background, principles of accident

5    reconstruction and my certification in that discipline, and

6    then also my medical expertise as a practicing emergency

7    medicine physician and board certified.

8        Q.    Okay.  And you mentioned that you are ACTAR

9    certified, what does that mean?

10       A.    ACTAR is a national organization that's been around

11   for, I want to say since the 70s or so, if I remember

12   correctly, and it is a group that provides a certification

13   examination for those seeking a certification in accident

14   reconstruction.  It's an application that is filled out and

15   then the review board has to approve you to sit for the

16   examination.  So if the credentials or background or experience

17   are not there, they will make you ineligible to sit for that

18   examination.

19                      I, you know, crossed that hurdle, sat for the

20   exam, passed the test.  It's in a written format and then also

21    a practical portion of the test where we actually have to do an

22    accident reconstruction.

23        Q.    And you are ACTAR certified, did I understand you

24    correctly?

25        A.    Yes, sir.  It's listed on my CV.

71

1        Q.    Okay.  Tell us what injury causation analysis is.

2        A.    Injury causation analysis has been around since, you

3    know, post-World War II days.  It's used both in litigation and

4    outside litigation for research purposes.  The Federal

5    Government does a lot of this type of work through NHTSA and

6    some of the databases that they have.  The basic principles are

7    trying to develop some kind of causal relationship between an

8    action or an event that occurs and the outcome or injury that

9    is claimed, that's the basic principles of it.

10                    It relies upon first and foremost, the accident

11   reconstruction itself, attempting to quantify what happens.  It

12   then moves into, you know, understanding how the cars are

13   moving or whatever, however the body is moving that would

14   result in the occupant kinematics, and then also move into

15   biomechanics of injury where the forces have to be applied to

16   cause certain types of injuries.  How do people need to move or

17   put themselves in certain positions to sustain those injuries,

18   and then looking at the medical records, trying to pull all

19   that information, looking at imaging studies, to then draw that

20   causal relationship or conclusion through that sequence and the

21   methodical approach to any type of injury.

22        Q.   What scientific disciplines are relied upon of

23   testifying as an expert in the field of rendering causation

24   analysis?

25        A.   For me, specifically, my engineering background.  We

1   talked about some of the aspects of that, conservation, energy,

2   momentum.  I mean, the basic principles of physics is

3   ultimately what guides us.  Newtonian's laws of motion, the

4   three laws of motion.  Also, my medical background

5   understanding injury mechanics and how they happened, that can

6   also be termed biomechanics.  They can be interchangeably used.

7                    How do injuries occur?  You know, certain bones

8   will fracture in certain ways depending on how you load them

9   and from what direction.  That was integral as part of my med

10  school and residency training as well.  And then applying my

11  medical background as far as being a treating physician and

12  managing patients with acute traumatic injuries.

13     Q.    How do the laws of physics assist you in rendering

14  opinions in injury causation analysis in this case?

15     A.    Well, they all have to be conserved, energy, momentum

16    has to be conserved.   Also, Newton's three laws are the main

17    principle ones that we rely upon in this.   You know, these have

18    been around for centuries.   This is not novel science that

19    becomes the foundation for that analysis.

20        Q.    What are the three laws of the laws of physics?

21        A.    The first law is Newton's First Law of Motion, an

22    object in motion will remain in motion unless acted upon by an

23    external force, or an object at rest will remain at rest until

24    acted upon by a force.

25             Newton's Second Law is that force equals mass

                                                                    73

1    times acceleration, that force is proportional to acceleration

2    which we talked about earlier in this deposition.

3             And then also the third law which is forces are

4    equal and opposite.   And in this case, you know, a force was

5   applied by the truck while the suburban had to equally resist

6   that force back for Newton's Third Law to be conserved, so

7   whatever force was applied to the suburban had to equally be

8   applied to the truck; so hence, Newton's Third Law as part of

9   this.

10       Q.   So those laws of physics assisted you in rendering

11   your opinions in this specific case?

12       A.   They are integral to that analysis, yes.

13       Q.   Okay.  Now you mentioned earlier in response to

14   Mr. Huber's question that you feel like that as an injury

15   causation analysis expert with a medical degree, you are in a

16   little bit better position to render opinions regarding

17   causation; is that true?

18       A.   That's correct.

19       Q.   And explain that to us, why is that true?

20       A.   Well, the simple fact that we are quantitatively

21  analyzing this particular incident.  We are trying to put a

22  number to it, which we then can rely upon the biomedical

23  literature, human-subject testing, lots of information out

24  there that you can draw parallels to, and that's what sets us

25  apart from treating physicians who may not have that

74

1  engineering underground background in science and math and so

2  forth, in that regard, so I think that's what separates me from

3  the treating physicians in the fact that I have this extra

4  component that I can bring to the table for the jury to

5  understand my relying upon the laws of physics.

6        Q.   So the fact that you are not a neurosurgeon or an

7  orthopedic surgeon, does that make your opinions any less

8  valid?

9        A.   No.  I have specific training to my discipline of

10    emergency medicine specific to orthopedics and neurosurgeon and

11    the diagnosis of acute injury.  I mean, let's face it, the

12    neurosurgeon and orthopedist aren't in the ER at 3 o'clock in

13    the morning making these diagnosis, I am.

14              Now I rely upon my specialized colleagues for

15    assistance when I realize that it is outside the scope of my

16    practice.  I mean, I am the first to admit to that, but again,

17    I mean, ultimately I need specialized training in multiple

18    disciplines orthopedics and neurosurgery included in order to

19    appropriately treat, diagnose, and disposition patients.

20       Q.    So I imagine in your medical practice, you have

21    treated patients who have been involved in automobile accidents

22    with spinal injuries; is that true?

23       A.    I have seen several cases where there is no dispute

24    about the injury where there is, you know, clear fractures and

25    paralysis and these types of things as opposed to this case

1   where there is a dispute about the extent of injury.

2       Q.   Okay.  And he also asked, Mr. Huber also asked you a

3   question about whether or not you've examined each of these

4   clients.  Have you heard of instances where doctors do record

5   reviews?

6       A.   Absolutely.  I have done it myself.

7       Q.   Okay.  And those are accepted in court?

8       A.   I mean, we amongst physicians accept it as -- as part

9   of our clinical practice.  We have a peer-review process within

10  medicine.  I was subjected to it; all of my colleagues are

11  subjected to it where we critically review charts of patients

12  that we have taken care of, whether a good or bad outcome may

13  have occurred to understand the reasoning behind why the

14  decisions were made to maybe change practice standards or

15  characteristics of how we approach certain patients or just

16    drawing caution and learning from those experiences.

17         Q.    Okay.   Now with respect to the facts in this case,

18    isn't it true that you were aware at least as far as the

19    plaintiff, Mr. Brown, was concerned and the driver was

20    concerned as to the speed of the vehicles in their review?

21         A.    Other than their deposition testimony, that's the

22    only location where speed was ever discussed.

23         Q.    Right.   And that's to some degree beneficial to you

24    in you rendering your opinions, is that a true statement?

25         A.    Yeah, I mean, I certainly take that into

                                                            76

1    consideration because as I said, the foundation of injury

2    causation analysis is the accident reconstruction component,

3    which is going to rely on some of that information to provide

4    some kind of opinion.

5       Q.      And while you may not have been at the scene, is it

6   true that some of the scene photographs were apparently taken

7   immediately after the accident had measurements that were

8   useful to you on the respective vehicles?

9       A.      There were distance measurements that were done as

10   part of that photograph.  I think you are referring to those

11   70-odd photographs or so, is that what we are talking about

12   here?

13      Q.      Yes, sir.

14      A.      Okay.  Yeah.  There was definitely a tape measure

15   involved in those photographs which my understanding were taken

16   at the scene on the evening of the incident and clearly

17   depicted the damage and provided me the information I needed to

18   understand as to how the two vehicles interacted with each

19   other to then reconstruct the accident.

20      Q.      So while you may not have gone and inspected the

21  scenes specifically after this accident or inspected the

22  particular vehicles involved in this accident, would those

23  photographs of benefit to you in sort of putting you at the

24  scene of the accident?

25      A.   They certainly helped, granded it was dark, some of

77

1   the photographs was kind of poor lighting condition.  I mean,

2   this happened at relatively low speeds.  There's not a whole

3   lot of damage involved.  So as far as seeing evidence, I think

4   the opposing counsel, you know, alluded to skid evidence and so

5   forth, a lot of that would have been very limited based on, you

6   know, my reconstruction of these events.

7       Q.   Now in connection with your opinions, Dr. Reinhart,

8   did you rely upon certain studies in peer review articles?

9       A.   Yes, the citations that I have provided as part of my

10  report certainly are submitted through the peer review process

11  in which they are critically reviewed analyzed before

12  publication.

13      Q.    And did that include any internal studies that would

14  have been generated by BRC?

15      A.    In this particular case, let me see, I am going to

16  scan down the list of...

17            I know the Banks article that was a peer review,

18  that's a BRC product.  The Gwin article, G-W-I-N, that's a BRC.

19  It was published through SAE which goes through a very rigorous

20  peer-review process.  And that particular article has some

21  great examples of measurements on human subjects of what we

22  call back to front accelerations which is exactly what the

23  occupants in this vehicle would have been attributed to.  And

24  the Gwin study, we did what's called a mattress drop, where

25  human subjects were dropped from two, four, and six feet onto a

78

1   mattress and a box spring and accelerations were measured at

2   the head, neck, and lower back and what we found is that these

3   far exceed the accelerations at a same occupant in a motor

4   vehicle that's struck from behind would experience.  So it's a

5   very pertinent article to my analysis.

6                       The two McConnell articles, these were some

7   older articles that were published from BRC also through the

8   peer-review process.

9        Q.   And all of those BRC articles relied upon peer

10  review; is that correct?

11       A.   Yes, so those four, yes, those would be the only four

12  that were BRC articles.

13       Q.   But those are peer reviewed externally from BRC?

14       A.   That is my understanding, yes.

15       Q.   Okay.  And in addition to that, did you rely upon

16   other studies that were peer reviewed externally -- I mean,

17   generated externally from people not associated with BRC?

18        A.   Yes, so the vast majority of the articles I cite were

19   certainly done outside of BRC and were submitted through, you

20   know, journals that I certainly recognize as peer -- apply the

21   peer-review process.

22        Q.   So for example the Fittano paper that you relied

23   upon, I think you mentioned that that related to elements of a

24   sideswipe accident; is that correct?

25        A.   Yeah, so that was published through the Society of

79

1   Automotive Engineers national organization, and I know for a

2   fact they use a very rigorous peer-review process for that.

3        Q.   And so while the actual mechanics of the accident

4   that were studied in the Fittano paper are not exactly similar

5   to what was experienced by the four individuals in the Brown

6   vehicle, is that study useful and beneficial to you in

7   rendering opinions in this case?

8        A.    Yes, it is because there is elements of it, you know,

9   damage comparisons, understand the mechanics of how the two

10  cars -- or the two vehicles would interact with each other and

11  how it differs from ours and also providing sort of some peak

12  acceleration, some quantitative measure under those

13  circumstances to at least maybe put a high watermark on this

14  particular incident is what I was after.

15       Q.    And it is the same true with respect to the Merala

16  and Whites paper that you relied upon, was that useful to you

17  in rendering your opinions in this case?

18       A.    Yes.  Again, gathering information from independent

19  testing to attempt in quantifying the severity of this crash.

20       Q.    Okay.  The testing that was done in this case with

21  the bumper, the testing apparatus that you used, was that a

22  testing apparatus that has been designed and the results peer

23  reviewed?

24      A.   That -- that particular test device that we use is

25  our bumper crusher device that we use in some low-speed

80

1  accident reconstruction.   There are four papers that have been

2  published on the bumper crusher.   In this case, if I didn't use

3  the bumper crusher in that regard, I used it as a test device

4  to measure a force.

5               So this is essentially a force measuring device

6  in -- in a pulling-type event; as opposed to the bumper crusher

7  papers which talks specifically about two bumper systems being

8  pushed together and measuring forces and displacements and

9  doing some calculations on that to provide Delta-v's

10  acceleration, these types of things.   In attempt to quantify

11   low-speed car accidents in a low-speed rear end incident, which

12   is different from this one, so I am not applying those

13   particular papers in this case.

14      Q.   But the testing apparatus is a part of the scientific

15   process you used in your causation analysis expert used to

16   reach your opinions; is that correct?

17      A.   It would apply to the same scientific methodology as

18   any design of any test apparatus for that matter, in an attempt

19   to prove or disprove your hypothesis.  In this case, we are

20   measuring a force, since the pressure device can be used

21   specifically for that purpose and can be designed to use for

22   that purpose.

23      Q.   And I think you said the testing was done under your

24   supervision; is that correct?

25      A.   I was physically present during that test, yes.

81

1      Q.    And the results of that testing are in the report --

2  are a part of your end product where you report your findings;

3  is that correct?

4      A.    Yes, based on the force data that came from that

5  test, that peak number that I referred to in my report, and I

6  will just highlight it again since you asked me about it.  It's

7  3,734 pounds is what was specifically measured on that testing

8  device.

9      Q.    Okay.  Why is that information useful to you,

10 Dr. Reinhart?

11     A.    Again, it provides me an upper limit or to what I

12 expect this crash to lie beneath and what I am relying upon

13 here is the damage pattern to our test bumper was far and

14 significantly more significant than what we noticed than on the

15 scene photographs from the night of the incident.  There is

16   significantly much more bumper deflection there than what we

17   see in those photographs.  So, again, I am trying to quantify

18   this crash by attributing the significance of that snagging

19   event as the bumper is being hooked by the ICC bar of the

20   trailer as it goes by.

21        Q.   And, in fact, you didn't do any testing for

22   kinematics, does that make your opinions in this case any less

23   valid?

24        A.   No, because we all can agree a force had to be

25   applied to the vehicle, that force is going to be directed, I

                                                                82

1   think I cite that in my report as well.  Let me just confirm

2   that with you here, should be in Conclusion Number 1, where I

3   talk about a principle direction of force between 5:00 and 6

4   o'clock, that's going to dictate how the occupants move.

5   There's a lateral component to it.  In other words, the car is

6  being pushed to the left as a result of the trailer coming

7  cross it, and also keep in mind that that line across the top

8  fender is a very, very shallow angle. It's not a very steep

9  angle. If there was a significant evasive steer put in by the

10 tractor-trailer drive, that trailer would have a much steeper

11 angle to it across the hood. Now Mr. Brown also said that he

12 steered to the left and tried to avasively avoid it, which

13 could narrow that angle down again, but at the end of the day

14 when those two vehicles interacted that had to have a very

15 shallow angle of attack; so there is a lateral component, but

16 it's primarily a frontal -- or a back to front component as the

17 bumper is being snagged and the car is being pulled out from

18 underneath the occupants which is going to move them rearward

19 into their seats and slightly to the right, that's based on the

20 laws of physics.

21     Q.   And so what changes in velocity would their bodies

22   have been subjected to as a result of this accident?

23        A.    Well, that becomes a little difficult because with

24   sideswipes, the vehicles don't neccesarily reach a common

25   velocity, so delta-v is a little gray in those situations.   You

83

1   can break it down into certain components.   I mean, in our case

2   with the force that was applied we said that the force was

3   anywhere between .6 and .7 -- I am sorry -- acceleration was

4   between .6 and .7gs that was based on the force that we

5   measured for the snagging and pulling event on the front of the

6   truck.

7                  If you assume a time period for that, you can

8   calculate a delta-v change, but you know that's -- it's still

9   going to be a very low delta-v event.   I mean, .6gs over -- you

10   know, even if you are generous and give it a half a second or a

11   second time period is not going to -- it's not going to give

12   you a whole significantly large delta-v.  In this particular

13   incident, this hooking and snagging event, I mean, once the car

14   is hooked and it's pulled up to speed with the trailer, there's

15   no more force being exerted to the occupants.  They talk about

16   it being snagged and it kind of travels together with the

17   trailer for a period of time.  They are moving at the same

18   speed there.  There is no differential anymore at that point.

19   It's the hooking and pulling event that is going to be the only

20   area where the delta-v would occur.

21      Q.   Would any of the change in velocity for G forces

22   exerted on the passengers in the Brown vehicle have been

23   sufficient to cause any sort of injury beyond a minor muscular

24   skeletal injury?

25      A.   No, that's my inconclusion here.   Based on the

                                                              84

1   reconstruction, based on the review of the medical records,

2   based on the biomechanics of injury, based on understanding the

3   biomechanics of the spine and how discs an vertebral -- how the

4   vertebra and the disc work together in conjunction that there

5   was no significant event under this acceleration that was

6   applied to the vehicle that would have ended in an acute disc

7   herniation or any injury more substantial than a mild muscular

8   strain or strain-type injury.

9       Q.   So you do concede thought that it's possible that

10  these occupants could have sustained some sort of injury as

11  result of the impact?

12      A.   Oh, I would never -- I would never deny that.  I

13  mean, putting myself in that perspective, the startle effect, I

14  mean, just being in that environment I would certainly never

15  said they were uninjured, but the extent of those injuries

16  would be significantly less than what's being alleged.

17      Q.    Have you testified in the state of Louisiana before

18   as an expert in injury causation analysis?

19      A.    I haven't testified in the state.  I am trying to

20   remember if I have had any deposition events that were

21   Louisiana cases and I don't think I have to date.

22      Q.    Well, one of your peers, Dr. Bain, is a medical

23   doctor and a peer of yours at BRC, isn't he?

24      A.    Yes, he is.

25      Q.    And to your knowledge, is Dr. Bain then precluded

                                                                85

1   from testifying in the state of Louisiana because he is not

2   licensed as a medical doctor in the state of Louisiana?

3      A.    I seem to recall something in that effect.  He has

4   also been struck and reinstated to testify as well.  Again,

5   every jurisdiction is different.  Every judge is different.

6      Every case is different.  It's hard to apply those same

7      standards to those deposition.

8          Q.    And, Dr. Reinhart, do you feel that by virtue of your

9      education, experience, training, you are able to assist the

10     jury in rendering decisions in this case as to whether or not

11     the occupants from the Brown vehicle sustained a significant

12     injury as a result of the automobile accidnet?

13                    MR. HUBER:  Object to the form.  Go ahead.

14         A.    Yes, I believe so in the simple fact that we provide

15     the additional quantification or severity or lack of lack of

16     severity in this particular incident as part of that analysis.

17                    MR. TRUITT:  That's all the questions I have.

18     Do you have any questions?

19                    MR. HUBER:  No, sir.  I am done.

20                    (Sotto voce discussion.)

21

22

23

24

25